LEIGH BROWN *et al.*,

        *Plaintiffs*,

    v.

FEDERAL ELECTION COMMISSION,

        *Defendant*.

Civil Action No. 19-1021 (TJK)

## <u>MEMORANDUM OPINION</u>

Does the First Amendment permit the Federal Election Commission to regulate, through disclaimer and disclosure requirements, long-running radio ads for a person's eponymous business once that person decides to run for federal office? Leigh Brown, a realtor and recent entrant into a primary race for a House of Representatives seat, argues it does not, largely because those requirements allegedly function as an outright ban on her ability to run them under the circumstances here. The crux of this case is whether that is so and, even if it is not, whether the FEC can regulate Brown's ads in the same way it does other speech about federal candidates shortly before elections.

Brown and her business, known as Leigh Brown & Associates, seek a preliminary injunction preventing the FEC from applying these disclaimer and disclosure requirements to radio ads for the business. But because they have neither shown a likelihood of success on the merits of the claims they have pled, nor demonstrated that they are likely to suffer irreparable harm in the absence of preliminary relief, the Court declines to issue an injunction. As explained below, only one set of Brown's ads are subject to the disclaimer and disclosure requirements under the statute at issue. And those requirements do not ban Brown or her business from speaking. Further, even when, as here, the regulated speech "only pertain[s] to a commercial

transaction," those requirements still serve the voting public's "interest in knowing who is speaking about a candidate shortly before an election." *Citizens United v. FEC*, 558 U.S. 310, 369 (2010).

## I. Background

### A. Statutory and Regulatory Framework

The Federal Election Campaign Act (FECA), 52 U.S.C. § 30101 *et seq.*, established the Federal Election Commission (FEC) and empowered it to interpret and enforce various campaign finance restrictions. *See Van Hollen, Jr. v. FEC*, 811 F.3d 486, 489 (D.C. Cir. 2016). The Supreme Court upheld most of FECA's spending limitations in *Buckley v. Valeo*, 424 U.S. 1 (1976), and adopted a narrowing construction of FECA's disclosure requirements such that they would only reach those ads that "expressly advocate[d] the election or defeat of a clearly identified candidate." *Van Hollen*, 811 F.3d at 489 (quoting *Buckley*, 424 U.S. at 80). After several decades, during which political advertisers developed creative workarounds to FECA's disclosure requirements, Congress passed the Bipartisan Campaign Reform Act (BCRA), Pub. L. No. 107-155, 116 Stat. 81, in 2002. *Van Hollen*, 811 F.3d at 489.

### 1. Electioneering Communications

The statutory and regulatory provisions primarily at issue here regulate speech about federal candidates shortly before elections. "BCRA recognized and regulated a new category of political advertising called 'electioneering communications,'" *id.*, and required certain disclaimers and disclosures to accompany electioneering communications to "provid[e] the electorate with information," *Citizens United*, 558 U.S. at 367 (quoting *Buckley*, 424 U.S. at 66). An electioneering communication is:

> any broadcast, cable, or satellite communication which—
>
> (I) refers to a clearly identified candidate for Federal office;

(II) is made within—

(aa) 60 days before a general, special, or runoff election for the office sought by the candidate; or

(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate.

52 U.S.C. § 30104(f)(3)(A)(i).  Relevant to the first element, BCRA defines "clearly identified" to mean that "the name of the candidate involved appears," "a photograph or drawing of the candidate appears," or "the identity of the candidate is apparent by unambiguous reference."  *Id.* § 30101(18).  The third element, targeting to the relevant electorate, is satisfied "if the communication can be received by 50,000 or more persons . . . in the district the candidate seeks to represent."  52 U.S.C. § 30104(f)(3)(C).

When a communication falls within this definition, two requirements for the person airing the ad are triggered.  The first is a disclaimer notice.  *See* 11 C.F.R. § 110.11(a).  The ad must include a "clear and conspicuous" disclaimer that specifies who paid for the ad and whether the candidate it mentions authorized it.  *Id.* § 110.11(b), (c)(1).  For radio ads authorized by the candidate, the ad "must include an audio statement by the candidate that identifies the candidate and states that he or she has approved the communication."  *Id.* § 110.11(c)(3)(i).

The second requirement is a report to the FEC disclosing various financial information about the ad.  *See* 52 U.S.C. § 30104(f); 11 C.F.R. § 104.20.  If a corporation paid for the ad, it must identify its corporate officers, the amount it has paid for electioneering communications,

and the candidates that they clearly identify.  11 C.F.R. § 104.20(a)(3), (c).[1]  This requirement

only applies once a corporation has spent more than $10,000 on electioneering communications

in a calendar year.  *Id.* § 104.20(b).

BCRA authorizes the FEC to promulgate regulations exempting communications from

these disclaimer and disclosure requirements as long as the communications do not "promote[]

or support[] a candidate for that office, or attack[] or oppose[] a candidate for that office

(regardless of whether the communication expressly advocates a vote for or against a

candidate)."  *See* 52 U.S.C. §§ 30101(20)(A)(iii), 30104(f)(3)(B)(iv).  The FEC has suggested

that it might also be able to create such exemptions on a case-by-case basis through the issuing

of advisory opinions, which require the vote of four Commissioners.  *See* 52 U.S.C. §§ 30106(c),

30108; Advisory Op. Request 2012-20 (Mullin), https://www.fec.gov/files/legal/

aos/2012-20/AO-2012-20.pdf.

## 2. Coordinated Communications

Also relevant to the instant motion are a set of restrictions on corporations' campaign-

related activity.  Campaign finance law has long prohibited corporations from donating to

campaigns.  *See FEC v. Beaumont*, 539 U.S. 146, 152–53 (2003).  In BCRA, Congress specified

that any electioneering communication that a corporation makes in coordination with a campaign

constitutes a prohibited donation.  52 U.S.C. § 30116(a)(7)(C).  This effectively bans

"coordinated communications," as the FEC calls them.  11 C.F.R. § 109.21(a).

The ban has a few, narrow exceptions.  *See* 11 C.F.R. § 109.21(f)–(i).  Relevant here is

the "[s]afe harbor for commercial transactions," which reads:

---

[1] A corporation must also disclose the identity of donors who have given over $1,000 "for the
purpose of furthering electioneering communications," 11 C.F.R. § 104.20(c)(9), but neither
party suggests that there are any such donors to Mallard Creek Properties, Inc.

A public communication in which a Federal candidate is clearly identified only in his or her capacity as the owner or operator of a business that existed prior to the candidacy is not a coordinated communication with respect to the clearly identified candidate if:

(1) The medium, timing, content, and geographic distribution of the public communication are consistent with public communications made prior to the candidacy; and

(2) The public communication does not promote, support, attack, or oppose that candidate or another candidate who seeks the same office as that candidate.

11 C.F.R. § 109.21(i).

### B. Leigh Brown's Business and Candidacy

Brown is a realtor in the Charlotte, North Carolina metropolitan area. ECF No. 11 ("Am. Compl.") ¶¶ 45–46. Since 2003, her corporation, Mallard Creek Properties, Inc., has done business as Leigh Brown & Associates, and employs eight people besides Brown herself. *Id.* ¶ 46. For the past thirteen years, Brown has recorded and aired radio ads for the business. *Id.* ¶¶ 47–48. She typically runs two ads at a time, recording new ones every 60 to 90 days. *Id.* ¶ 48. These ads

generally are 60 seconds in length, and typically feature discussion of a real estate issue specific to the Charlotte real estate market (e.g., local property values and trends in housing prices). For the past several years, the advertisements typically note how many houses her team sells and consistently include two closing slogans: "I'm interviewing for a job[;] I want to be your realtor" and "There is a difference when you call Leigh Brown."

*Id.* ¶ 51. She has contracted to air 706 ads for $48,204 in 2019. *Id.* ¶ 47.

Earlier this year, Brown entered the primary for the special election for the seat in the U.S. House of Representatives representing North Carolina's Ninth Congressional District. *Id.* ¶¶ 34, 45. That primary election will take place on May 14, 2019.[2] *Id.* ¶ 34.

---

[2] The timing of the general election—a special election held off-cycle—will depend on the results of the May 14 primary. If any candidate obtains more than thirty percent of the vote, the

## C.      FEC Proceedings

Shortly after announcing her candidacy, Brown sought an advisory opinion from the FEC

about four radio ads for Leigh Brown & Associates.  *Id.* ¶ 33.  The first two were ads Brown was

already airing on the radio.  They read as follows:

> In a world where everything seems to be online and at the click of a button, you
> have to realize that real estate pricing is just not an exact science.  I'm Leigh Brown
> with RE/MAX and I'm getting a lot of phone calls about the current tax valuations
> and the updates to the process.  My clients need help with disputing that number
> because occasionally it's wrong.  I also have folks that want to know what their
> property is worth based on their upgrades and condition and I can give a more
> accurate ballpark than a website can.  Frankly, y'all, the reason you have a trusted
> Realtor is that we are there for you between the buying and the selling and all steps
> in between.  My team and I sell a house every two days, y'all, and that's not
> bragging.  That's interviewing for a job.  In fact, the job I want is to be your Realtor
> for life.  For more information, visit my website at leighsells.com or call anytime
> at 704-705-7036, that's 705-7036.  There is a difference when you call Leigh
> Brown.
>
> . . .
>
> I believe it's a natural human reflex to see a Realtor and ask, "Hey, how's the
> market?"  I'm Leigh Brown with RE/MAX and I can tell y'all that is the number
> one question I'm being asked right now by folks considering buying or selling real
> estate in the Charlotte market.  Sellers should know that while prices are still
> creeping upward, so are days on market.  That's reducing the number of multiple
> offer situations although frankly it all depends on what zip code you're in and your
> price point.  Now, let's look at those factors differently and realize it creates a
> favorable situation for buyers.  Add great interest rates to the normalization of the
> market and you probably should consider calling me for an evaluation on buying
> and selling.  You can always get information on my website at leighsells.com and
> find out why my team and I are selling a house every two days.  I'm not bragging
> about that statistic, y'all, I'm interviewing for a job.  I want to be your Realtor.  Call
> me anytime at 704-705-7036, that's 705-7036.  There is a difference when you call
> Leigh Brown.

---

general election will be in September 2019; if not, a runoff election will be in September and the
general election will be in November 2019.  *See* Def.'s Opp'n at 41; FEC, *Special election report
notice: North Carolina Special Election 9th Congressional District*, https://www.fec.gov/help-
candidates-and-committees/dates-and-deadlines/2019-reporting-dates/special-election-report-
notice-nc09/.

ECF No. 12-1 ("Pls.' Mot.") at 4–5.  Brown asked the FEC for an advisory opinion exempting these two ads from the disclaimer and disclosure requirements related to electioneering communications.  Am. Compl. Ex. A.

Brown proposed a set of alternative ads should the FEC not exempt the original ones.  *Id.* at 7.  These alternative ads made two changes to the original scripts: (1) they substituted "Leigh Brown & Associates" for any instance of "Leigh Brown"; and (2) they substituted either "we", "we're" or "our" for any instance of "I", "I'm" or "my."  *Id.* at 7–8.  Brown asked that the FEC issue an advisory opinion that these alternative ads were not electioneering communications because they did not refer to a clearly identify a candidate.  *Id.* at 8–9.  Because Brown planned to voice these alternative ads herself, she also requested that the FEC determine that her voice alone would refer to a clearly identified candidate.  *Id.*

On April 11, 2019, the FEC held a hearing on Brown's request.  Am. Compl. ¶ 32. Because no draft advisory opinion received four votes, the FEC did not issue any advisory opinion.  *Id.* ¶ 59; *see* 52 U.S.C. §§ 30106(c), 30107(a)(7).

D.    **The Instant Case**

Brown initiated this action and moved for a temporary restraining order the same day of the FEC hearing.  After the government responded and the Court heard argument, it denied the motion and set an expedited schedule for her anticipated preliminary injunction motion. Thereafter, Brown and Mallard Creek Properties, Inc., (collectively, "Plaintiffs") filed an amended complaint as well as a motion for a preliminary injunction; the Court heard argument on that motion on April 26, 2019.[3]

---

[3] Plaintiffs on the original complaint included Brown, her campaign, and Leigh Brown & Associates.  *See* ECF No. 1.  Mallard Creek Properties, Inc., joined this action, and Brown's campaign and Leigh Brown & Associates departed it, in the amended complaint.  *See* Am. Compl.

In their amended complaint, Plaintiffs bring three counts: (1) a claim that the electioneering communications rules are unconstitutional under the First Amendment as applied to Brown's original ads; (2) a claim that the electioneering communications rules are unconstitutional under the First Amendment as applied to Brown's alternative ads; and (3) a claim urging the Court to employ the canon of constitutional avoidance to determine that none of the ads are electioneering communications under the statute. They have moved for a preliminary injunction on each count.

Plaintiffs insist that neither set of ads meets the statutory definition of electioneering communication. Pls.' Mot. at 24–26. But, assuming they do, Plaintiffs' motion characterizes the relevant rules as creating a "quandary" for them that effectively bans them from speaking. *E.g.*, Pls.' Mot. at 14. If her radio ads are electioneering communications, they say, Brown must include a disclaimer saying that she either did or did not authorize the ads. *Id.* The latter would be untrue because she wrote and recorded them; the former would, they contend, make the ad a coordinated communication and therefore an illegal campaign contribution by her company. *Id.* at 14–15. Her choice, as they see it, is to lie or to not air her ads at all. *Id.* at 15–16, 19–20.

The FEC argues that there is no quandary. ECF No. 14 ("Def.'s Opp'n") at 21. To comply with the disclaimer requirement, the FEC says, all Brown has to do is state at the end of her ad that she authorized the ad but her business paid for it. *Id.* at 22–23. The FEC posits that she will probably not spend the $10,000 required to trigger the reporting requirement but that, were she to, her company would merely have to submit a standard form. *Id.* And the FEC says she need not do anything at all to avoid the coordinated communications ban because her ads fall within the safe harbor for those proposing commercial transactions under 11 C.F.R. § 109.21(i). *Id.* at 22.

## II. Legal Standard

A preliminary injunction is an "extraordinary remedy." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). To receive it, Plaintiffs "must make a 'clear showing' that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in [their] favor, and accord with the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016) (quoting *Winter*, 555 U.S. at 20, 22). When the government is the party opposing a preliminary injunction, the Court analyzes the latter two factors as one "because the government's interest *is* the public interest." *Id.* at 511 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Before the Supreme Court decided *Winter*, courts in this Circuit analyzed these factors on a sliding scale, so that a plaintiff's weak showing on one could be overcome by a strong showing on the others. *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011). The D.C. Circuit "has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley*, 644 F.3d at 392). In any event, the Court need not determine the continued validity of the sliding-scale approach because, without a likelihood of success on the merits, Plaintiffs are not entitled to a preliminary injunction regardless of their showing on the other factors. *See Ark. Dairy Coop Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009).

## III. Analysis

### A. Jurisdiction

Before turning to the merits of Plaintiffs' request for a preliminary injunction, the Court must briefly address a few jurisdictional matters. Both BCRA and FECA offer special review

procedures when certain plaintiffs bring constitutional challenges to their provisions.  *See* 52

U.S.C. § 30110 & note.  The Court therefore ordered the parties to address at the preliminary

injunction hearing whether either procedure deprived this Court of jurisdiction over Plaintiffs'

constitutional claims or their motion for a preliminary injunction.  The Court is satisfied that

neither does.

BCRA's special review procedure permits plaintiffs to request three-judge panels to hear

their constitutional claims.  *See Indep. Inst. v. FEC*, 816 F.3d 113, 115 (D.C. Cir. 2016).  When a

plaintiff does not make such a request, however, a district court retains jurisdiction.  *See* 52

U.S.C. § 30110 note.  At the hearing on Plaintiffs' preliminary injunction motion, Plaintiffs

expressly disclaimed any request for a three-judge panel.

FECA's special review procedure applies to individuals' constitutional challenges to the

Act's provisions (although not to the regulations promulgated under it).  *See id.* § 30110; *Wagner

v. FEC*, 717 F.3d 1007, 1010–11 (D.C. Cir. 2013) (per curiam).  This deprives a district court of

jurisdiction over the merits and requires that the court "immediately certify the record and all

non-frivolous constitutional questions to the *en banc* court of appeals."  *Wagner*, 717 F.3d at

1009, 1011.  At the hearing, the parties disagreed on whether this provision governs any piece of

Plaintiffs' complaint: Plaintiffs asserted it covers Brown's challenge to the statutory provisions

about electioneering communications, and the FEC asserted that Plaintiffs' FECA claims are too

frivolous to warrant certification.  But they both insisted that even if this procedure applies, it

does not deprive the Court of its jurisdiction to rule on Plaintiffs' preliminary injunction motion.

The Court agrees.  And district courts in this Circuit have decided preliminary injunction

motions under these circumstances.  *See, e.g.*, *Holmes v. FEC*, 71 F. Supp. 3d 178, 181–82 & n.3

(D.D.C. 2014) (denying preliminary injunction despite applicability of FECA's special review

procedure); *Rufer v. FEC*, 64 F. Supp. 3d 195, 203–06 (D.D.C. 2014) (denying preliminary injunction after concluding that the constitutional claims must be certified to the *en banc* D.C. Circuit).

Therefore, although the Court may yet have to certify some portion of Plaintiffs' constitutional claims to the *en banc* D.C. Circuit, it determines that it can decide their request for a preliminary injunction.

### B.      Plaintiffs' Likelihood of Success on the Merits

Counts I and II of Plaintiffs' amended complaint are as-applied First Amendment challenges to the electioneering communications rules. *See* Am. Compl. ¶¶ 71–88. Count III contains no cognizable cause of action, as discussed in more detail below, but Plaintiffs frame the relief they are seeking through Count III as a declaration that Brown's ads are not electioneering communications under the statute. Pls.' Mot. at 24 ("[T]his Court can grant an injunction pursuant to Count Three as the advertisements at issue are not electioneering communications because they do not refer to a clearly identified candidate[.]").

Whether Brown's ads are in fact electioneering communications bears on the merits of all three counts in Plaintiffs' amended complaint, so the Court will address that question first. Indeed, one court framed the question of whether a plaintiff's ads were electioneering communications as a predicate to reaching its as-applied constitutional challenges. *See Hispanic Leadership Fund, Inc. v. FEC*, 897 F. Supp. 2d 407, 431 (E.D. Va. 2012) ("Given that three of [the plaintiff's] five proposed advertisements constitute electioneering communications, it is appropriate next to consider [its] as-applied challenges to the electioneering communication statutes.").

For the reasons explained below, the Court determines that Brown's original ads likely are electioneering communications and that her alternative ads likely are not. As for the original

ads, then, the Court proceeds with the constitutional analysis in evaluating the merits of Count I.

The Court must first determine the level of scrutiny to apply in evaluating the constitutionality of

the electioneering communications rules. Because the Court rejects Plaintiffs' argument that the

electioneering communications rules function as an outright ban on their speech, the Court

applies exacting scrutiny. Finally, the Court finds that the disclaimer and disclosure

requirements that apply to electioneering communications likely withstand exacting scrutiny as

applied to Brown's original ads under the rationale expounded by the Supreme Court in *Citizens*

*United.* For these reasons, Plaintiffs are not likely to succeed on the merits of Count I. In

addition, Plaintiffs cannot show a likelihood of success on Count III as to the original ads both

because that count does not plead a cause of action and because, in any event, it appears

predicated on a determination that the original ads are not electioneering communications.

Plaintiffs have also not shown a likelihood of success on either of the counts related to

the alternative ads. Because Brown's alternative ads likely are not electioneering

communications, Plaintiffs cannot show a likelihood of success on their as-applied constitutional

challenge to those ads in Count II. And notwithstanding the Court's determination that the

alternative ads likely are not electioneering communications, because Count III contains no

discernible cause of action, Plaintiffs have not shown a likelihood of success on that count as to

the alternative ads. Ultimately, then, the Court concludes that Plaintiffs are unlikely to succeed

on the merits of any of their claims.

### 1. Whether Brown's Ads Are Electioneering Communications

An electioneering communication has three elements: it refers to a clearly identified

candidate, airs within 30 days before a primary election, and targets the relevant electorate. 52

U.S.C. § 30104(f)(3)(A). Plaintiffs appear to have conceded that the original ads meet all three

elements both before the FEC and in their original complaint in this case. *See* Am. Compl. Ex. A

at 1; ECF No. 1 ¶¶ 25–26.  They retracted that concession in their amended complaint, but the

parties still agree that, for both sets of ads, only the first element is at issue.  *See* Pls.' Mot. at 24;

Def.'s Opp'n at 34.

### a.    Brown's Original Ads

For the original ads, Plaintiffs maintain that they refer to Brown "as a realtor and not as a

clearly identified candidate."  Pls.' Mot. at 24.  But this argument rewrites the statute in a subtle

but significant way.  The definition of electioneering communication requires only that ads

"refer[] to a clearly identified candidate."  52 U.S.C. § 30104(f)(3)(A)(i)(I).  The statute does not

require that the ads refer to the candidate *as a* candidate, or even that they reference an election.[4]

Both of Brown's original ads include the phrases, "I'm Leigh Brown," and "when you call Leigh

Brown."  Pls.' Mot. at 4–5.  By any measure, these ads refer to Brown, who is "clearly

identified" because her name appears in them.  52 U.S.C. § 30101(18)(A).

The Court thus concludes Brown's original ads likely are electioneering communications,

and to the extent they target the relevant electorate and air within 30 days of the primary election,

they would likely be subject to the disclaimer and disclosure requirements.  Thus, the Court will

proceed below to the constitutional analysis applicable to the original ads in evaluating

Plaintiffs' likelihood of success on Count I.  In addition, Plaintiffs are unlikely to succeed on

Count III as to the original ads both because that count appears to be predicated on a

---

[4] Plaintiffs argue that "there is no suggestion anywhere in the legislative record that Congress
intended to include bona fide commercial advertisements for commercial products and services
in the definition of electioneering communications."  Pls.' Mot. at 21.  But their speculation
about what Congress might have intended is of no moment, given that "[t]he best evidence of
[Congress's] purpose is the statutory text."  *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98–
99 (1991).  Plaintiffs also argue that because Brown's ads are commercial speech unrelated to an
election, they are outside the FEC's authority to regulate.  *See* Pls.' Mot. at 25–26.  But Congress
gave the FEC the authority to regulate all speech within the scope of BCRA's definition of
electioneering communications.  There is no basis, as a matter of statutory interpretation, for the
Court to conclude otherwise.

determination that the ads are *not* electioneering communications, and, as discussed in more detail below, because Count III does not contain a cognizable cause of action.

### b. Brown's Alternative Ads

Brown's alternative ads make only small changes to the original ads, but those changes make all the difference for purposes of determining whether they are electioneering communications under the statute. The FEC asserts that the ads "can be viewed as referring to a clearly identified candidate" because "they feature Brown's actual voice" and the ad "twice references her firm which includes her name." Def.'s Opp'n at 37–38. But neither of those factors, separately or together, cause the alternative ads to "refer[] to" Brown. 52 U.S.C. § 30104(f)(3)(A)(i)(I). They refer, instead, to her business.

The FEC spends most of its effort arguing the significance of Brown's voicing the alternative ads herself, but it never persuasively explains why that makes them electioneering communications. It argues that "it is permissible to find that listeners in the Charlotte area would recognize" Brown as the speaker, Def.'s Opp'n at 38, thus causing the ad to refer to her by "unambiguous reference," 52 U.S.C. § 30101(18)(c). But the ad itself does not provide the Court the basis to so conclude. And neither does the current record, even assuming it were proper for the Court to consider evidence relating to the recognizability of Brown's voice.

The FEC's back-up argument gets it no further. The alterative ads refer to "Leigh Brown & Associates," the business, not to "Leigh Brown" the person. *See* Pls.' Mot. at 5–6. In fact, the FEC's characterization of its own argument aptly demonstrates why it fails. The FEC argues that the alternative ads "twice *reference[] her firm* which includes her name," Def.'s Opp'n at 37, and "*refer to the company* which includes the candidate's name," Def.'s Opp'n at 38 (emphasis

added).  The FEC is right.  Because the alternative ads "refer[] to" Brown's business and not to her, they are not electioneering communications.[5]  52 U.S.C. § 30104(f)(3)(A)(i)(I).

Despite this determination, the Court concludes that Plaintiffs are unlikely to succeed on either Count II or Count III as to the alternative ads.

Given that the alternative ads likely are not electioneering communications, Plaintiffs have not shown a likelihood of success on their as-applied First Amendment claims related to those ads.  "[A] plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014) (emphasis in original).  That is, Plaintiffs must demonstrate "a credible threat of enforcement" against their alternative ads by the FEC. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014).  That requires a showing both that the "intended future conduct is 'arguably . . . proscribed by [the] statute' they wish to challenge" and that the threat of future enforcement against that conduct is "substantial." *Id.* at 162–64 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  In light of those standards, the Court cannot conclude that it is "sufficiently likely" that the FEC will impose the disclaimer and disclosure requirements on the alternative ads such that they would be entitled to judgment on Count II.

The Court finds it reasonably clear that Plaintiffs' alternative ads likely do not fall within the statute's definition of an electioneering communication.  To be sure, the argument that those

---

[5] The FEC does not argue that the alternative ads refer to Brown by operation of 52 U.S.C. § 30101(18)(a).  That provision of the BCRA provides that one of the ways a candidate is "clearly identified" is if "the name of the candidate involved appears" in the communication. But there is no need to determine if a candidate is "clearly identified" if the communication does not "refer[] to" a candidate in the first place.  52 U.S.C. § 30104(f)(3)(A)(i)(I).  And for the reasons explained above, Brown's alternative ads refer to her business, and not to her.

ads do in fact fit within that definition and thus are subject to the disclaimer and disclosure requirements is "arguable"; indeed, when Plaintiffs sought an advisory opinion from the FEC finding that the ads were not electioneering communications, it declined to issue it. But declining to issue an advisory opinion is a far cry from undertaking enforcement action. Particularly telling is that, even before the Court's determination, three of the four commissioners concluded that the alternative ads *were not* electioneering communications. *See* Am. Compl. Ex. C at 2; Audio of FEC Consideration of AOR 2019-06 at Its April 11, 2019 Open Meeting, https://www.fec.gov/resources/cms-content/documents/2019041105.mp3 (relevant discussion from 41:40 to 42:09). Otherwise, Plaintiffs have not pointed to any instance in which the FEC took such action against comparable ads. And the Court, especially in light of its conclusions here, has no reason to suspect that the FEC will engage in enforcement action under these circumstances.

It is not enough to simply show a colorable argument that intended future conduct might be subject to a challenged statutory provision. To ultimately succeed on their constitutional claim, Plaintiffs must demonstrate that there actually exists a likelihood that the FEC will undertake enforcement action if they engage in that conduct, and the record before the Court is simply insufficient to so conclude. Thus, without any reasonable expectation that the FEC will, in fact, apply the disclaimer and disclosure rules against the alternative ads, the Court cannot conclude that Plaintiffs have demonstrated a likelihood of success on Count II.[6]

Plaintiffs are also unlikely to succeed on the merits of Count III as to the alternative ads, but for a much more elementary reason. Count III contains no discernible cause of action. In

---

[6] *Cf. Hispanic Leadership Fund*, 897 F. Supp. 2d at 431 (declining to reach analysis of plaintiff's as-applied First Amendment claims upon concluding that certain ads were not electioneering communications under the statute).

that count, Plaintiffs request a judgment from the Court declaring that the ads are not electioneering communications under the statute. *See* Am. Compl. at 23. And to be sure, in undertaking the analysis relevant to the constitutional causes of action pled in Count II, the Court has in effect agreed with Plaintiffs on this point. But that does not relieve Plaintiffs of their burden to show a likelihood of success on a cause of action pled in the amended complaint, which is, beyond any doubt, required for a preliminary injunction. And simply put, Count III does not aid them in meeting that burden. The thrust of Count III is that the ads are not electioneering communications under BCRA for various reasons, but it alleges no underlying legal right that would entitle Plaintiffs to a judgment reflecting a freestanding determination that that is so. *Id.* ¶¶ 89–104. Plaintiffs purport to base their entitlement to such a judgment on the canon of constitutional avoidance, but that is a principle of statutory construction, not a cause of action. *See* Am. Compl. at 23 ("To Avoid First and Fourteenth Amendment Problems, this Court Should Find that the Advertisements are not Electioneering Communications and issue an Injunction"). Perplexingly, at both hearings, Plaintiffs disclaimed any attempt to rely on the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.*, and there is no reference to the APA in the amended complaint. *Cf. Hispanic Leadership Fund*, 897 F. Supp. 2d 407 (entering declaratory judgment that advertisements were not electioneering communications on a pre-enforcement APA claim). Accordingly, because there is no cognizable cause of action on which Plaintiffs could succeed in Count III, Plaintiffs have not demonstrated that they are likely to succeed on it, even regarding the alternative ads.[7]

---

[7] In contrast to Counts I and II, Count III is not pled as a constitutional claim. It does mention in passing Plaintiffs' rights under the First and Fifth Amendments, but only, it appears, in connection with the Plaintiffs' exhortation that the Court should invoke the canon of constitutional avoidance. *See* Am. Compl. ¶¶ 90–93, 100–04. And in their hodgepodge of

## 2. Whether the FEC Rules Are a Ban on Plaintiffs' Speech

Count I remains. Having decided that the disclaimer and disclosure requirements likely apply to Brown's original ads, the Court next looks to the consequences of that application. As explained above, Plaintiffs argue that the electioneering communications rules and the coordinated communications ban put them in a quandary; they contend that the only way they can comply with all of them is to not run the ads at all. Pls.' Mot. at 14. The disclaimer they would have to include at the end of the radio ads would, Plaintiffs assert, cause them to be subject to the ban on coordinated communications. *Id.* at 15. And as such, because the electioneering communications rules function as an outright ban on her speech, they must be subject to strict scrutiny, which they cannot survive. *See id.* at 12, 20.

The FEC argues that Brown's ads fall within the safe harbor to the coordinated communications ban for ads proposing commercial transactions, so there is no quandary. Def.'s Opp'n at 22. But Plaintiffs protest that the safe harbor cannot relieve them of the coordinated communications ban because the safe harbor does not apply to ads that promote, attack, support, or oppose the candidate they identify. ECF No. 15 at 10–11; *see* 11 C.F.R. § 109.21(i). And as Plaintiffs' counsel clarified at the hearing on the instant motion, Plaintiffs contend that merely adding the electioneering communications disclaimer to the end of the original ads—that is, saying that Brown had authorized them—would necessarily promote or support Brown as a candidate and therefore disqualify them from the safe harbor.

The Court agrees with the parties that whether Brown's original ads fall within the safe harbor dictates whether she can lawfully air them under the coordinated communications rules.

---

arguments related to the merits of Count III in their motion, Plaintiffs do not argue that Count III alleges a violation of the First or Fifth Amendments. *See* Pls.' Mot. at 24 ("Plaintiffs' Speech is Commercial and the FEC is Without Power to Regulate Purely Commercial Speech, and These Advertisements are Not Electioneering Communications").

But the answer to that question does not dictate whether a preliminary injunction is warranted here. Plaintiffs have challenged only the disclaimer and disclosure requirements for electioneering communications and ask only for an injunction that would prohibit the FEC from applying them to the ads. *See* Am. Compl. ¶ 1; ECF No. 12-2 at 1. Moreover, at the hearing on the instant motion, Plaintiffs' counsel explicitly disclaimed challenging the coordinated communications ban or the safe harbor.[8] Thus, the coordinated communications ban and the safe harbor are before the Court only to the extent that the disclaimer and disclosure requirements impact their application to Brown's ads.

As described above, Plaintiffs argue that the disclaimer and disclosure rules impact the application of the coordinated communications ban and safe harbor to Brown's original ads in two ways: (1) if Plaintiffs include a disclaimer saying that Brown authorized the ads and file a report saying she helped create them, the ads will become coordinated communications and therefore be prohibited; and (2) the disclaimer would necessarily promote or support Brown, so that they could not then rely on the safe harbor. But neither theory withstands scrutiny. First, whether the ads are coordinated has nothing to do with what Brown says in the ad or reports to the FEC about the ad; all that matters is whether Brown did, in fact, work with her company to create the ad. *See* 11 C.F.R. § 109.21(d)(2) (treating communications as coordinated if the candidate is "materially involved in decisions regarding" the ad). Here, Brown has "written and recorded" both sets of ads, Am. Compl. Ex. D ¶ 39, so the coordinated communications ban applies irrespective of any disclaimer she includes or report she files.

---

[8] Plaintiffs also declined to seek an advisory opinion from the FEC related to its application of the coordinated communications ban and the safe harbor to the circumstances here. *See* Am. Compl. Ex. A. at 5–6.

Nor do the disclaimer and disclosure requirements affect the availability of the safe harbor for commercial transactions. To comply with the disclaimer rule for electioneering communications, Brown merely has to say that she authorized the ad and her business paid for it. 11 C.F.R. § 110.11(c). Neither statement "promotes" or "supports" her in any way.

Because the disclaimer and disclosure requirements challenged by Plaintiffs do not affect whether the coordinated communications ban applies to them, the quandary that purportedly censors their speech arises from a regulatory scheme entirely separate from the one they have challenged here. Put another way, even if the Court granted a preliminary injunction enjoining the FEC from applying the disclaimer and disclosure rules to Brown's original ads, it would not affect whether these communications were coordinated, or whether the safe harbor applied to them. The constitutionality of the coordinated communications ban and its effect on Plaintiffs here are simply not before the Court.

The only parts of the purported quandary that are before the Court, as pled in the amended complaint and as reflected in the preliminary relief sought by Plaintiffs, are the application of BCRA's disclaimer and disclosure requirements to Brown's original ads. And the Supreme Court has determined that because those rules do not prohibit speech, they are subject only to exacting scrutiny.[9] *Citizens United*, 558 U.S. at 366.

### 3. Whether the Electioneering Communications Rules Survive Exacting Scrutiny

Although almost all of Plaintiffs' argument focuses on this purported quandary, they also contend, presumably as part of Count I, that even if the disclaimer and disclosure rules are not a ban on speech, they are still unconstitutional as applied to the original ads. *See* Am. Compl. ¶ 8 ("In the alternative, if this Court determines that FECA and the FEC's parallel implementing

---

[9] Plaintiffs' arguments about other levels of scrutiny, Pls.' Mot. 8–14, are therefore inapposite.

regulations do not operate a prior restraint on speech, which they do, Plaintiffs still challenge the disclaimer and disclosure requirements as overbroad under 'exacting scrutiny.'"); Pls.' Mot. at 23–24. The Court will thus turn to the question of whether the disclaimer and disclosure rules, operating on their own, unconstitutionally burden Plaintiffs' speech.

Courts "view disclosure rules far less skeptically than [they] do bans on speech." *Pursuing Am.'s Greatness*, 831 F.3d at 507. To comport with the First Amendment, a disclosure requirement must pass "exacting scrutiny," which requires the disclosure requirement to be substantially related to a sufficiently important government interest. *See Citizens United*, 558 U.S. at 366–67.

The Supreme Court first applied exacting scrutiny to BCRA's electioneering communications rules in *McConnell*. There, the Court upheld the definition of electioneering communications, which it described as "easily understood and objectively determinable." 540 U.S. at 194. It then upheld the disclosure requirements as substantially related to the government interest in "'provid[ing]' the electorate with information' about the sources of election-related spending." *Citizens United*, 558 U.S. at 367 (alteration in original) (quoting *Buckley*, 424 U.S. at 66); *see McConnell*, 540 U.S. at 196. Because "independent groups were running election-related advertisements 'while hiding behind dubious and misleading names,'" the Court reasoned that the disclaimer and disclosure requirements "would help citizens 'make informed choices in the political marketplace.'" *Citizens United*, 558 U.S. at 367 (quoting *McConnell*, 540 U.S. at 197).

*McConnell* explicitly left open the possibility for an as-applied challenge to the electioneering communications rules if a plaintiff could show that revealing the names of its donors would likely "subject them to threats, harassment, or reprisals from either Government

21

officials or private parties."[10] *McConnell*, 540 U.S. at 198 (quoting *Buckley*, 424 U.S. at 74).

Then, in *Wisconsin Right to Life v. FEC*, 546 U.S. 410, 412 (2006) (per curiam), the Supreme

Court reaffirmed that *McConnell* "did not purport to resolve future as-applied challenges."

The Supreme Court considered another as-applied challenge to the electioneering

communications rules in *Citizens United*. *See* 558 U.S. at 366–71. In *Citizens United*, the

plaintiff nonprofit corporation challenged the application of those rules to two types of

electioneering communications: first, a movie about then-presidential candidate Hillary Clinton,

and second, television ads for the movie that "include[d] a short (and, in [the Court's] view,

pejorative) statement about Senator Clinton, followed by the name of the movie and the movie's

Web site address." *Id.* at 320. The Court, following the logic of *McConnell*, upheld the

disclaimer and disclosure requirements as applied to both types of electioneering

communications. *Id.* at 368–70. Most relevant here, the Court considered the requirements

constitutional as applied to the ads despite their commercial nature. As the Court held, "[e]ven if

the ads only pertain to a commercial transaction, the public has an interest in knowing who is

speaking about a candidate shortly before an election." *Id.* at 369.

Plaintiffs argue that the Supreme Court's reasoning in upholding the electioneering

communications rules does not extend to the circumstances here. *See* Pls.' Mot. at 23–24. They

contend that the ads in *Citizens United* are distinguishable from Brown's ads because they

advertised a movie that was critical of Clinton's record and candidacy and "were not long

standing." *Id*. In contrast, they argue, Brown's original ads have been on the air for many years

---

[10] As noted above, Plaintiffs do not assert that they would be required to disclose any donors'
names at all, let alone that doing so would subject them to harassment.

and are unrelated to the election. *See id.* at 26. Plaintiffs urge the Court not to decide this case based on the "broad sounding language" in prior cases. *Id.* at 24.

Despite Plaintiffs' arguments to the contrary, though, the reasoning of the Court in *Citizens United* in upholding the disclaimer and disclosure requirements under exacting scrutiny applies equally to Brown's original ads. This is so because they refer to her—the candidate—regardless of the nature of any message they may convey to the electorate. In *Citizens United*, the Court held that the disclaimer requirement was substantially related to an informational interest because it "avoid[s] confusion" and "mak[es] clear that the ads are not funded by a candidate or political party." *Citizens United*, 558 U.S. at 368. That interest is served here as well: a disclaimer stating that Leigh Brown & Associates paid for the ads clarifies for listeners that they were not paid for by Brown's campaign, an opponent, or some other third party. The Court also concluded that the disclaimer and disclosure requirements served this informational interest by informing voters "who is speaking about [the] candidate shortly before [the] election" even though the speech at issue was related to "a commercial transaction." *Id.* at 369. That interest is also satisfied in this case—again, notwithstanding the fact that the ads are commercial in nature. And, it bears repeating, the disclaimer and disclosure requirements here, as in *Citizens United*, do not prevent anyone from speaking. *Id.* at 366.

Although Plaintiffs argue that Brown's original ads are "plainly and unquestionably not related to the election," Pls.' Mot at 26, there is no indication in *McConnell* or *Citizens United* that the Court considered a communication's message in applying exacting scrutiny to the electioneering communications rules.[11]   It was enough to serve the public's informational

---

[11] As the FEC points out, a member of Congress used this language to describe the authority that BCRA provides the FEC to exempt certain communications from these disclaimer and disclosure

interest, it appears, that the communication referred to a clearly identified candidate shortly before an election.  Admittedly, in *Citizens United*, the Court twice alluded to the ads as conveying a message about Clinton's candidacy: it described them as "includ[ing] a short (and, in our view, pejorative) statement about Senator Clinton," 558 U.S. at 320, and "contain[ing] pejorative references to her candidacy," *id.* at 368.  But this Court does not read those descriptions of the ads to limit the Supreme Court's holding, as neither appears directly relevant to its reasoning.  *See id.* at 367–71.

Other courts have read *Citizens United* similarly by holding that the disclaimer and disclosure requirements pass exacting scrutiny irrespective of the nature of the message conveyed by the communications at issue.  Judge Millett, writing for a three-judge panel in this Circuit, noted that "the Supreme Court and every court of appeals to consider the question have already largely, if not completely, closed the door to the [plaintiff's] argument that the constitutionality of a disclosure provision turns on the content of the advocacy accompanying an explicit reference to an electoral candidate." *Indep. Inst. v. FEC*, 216 F. Supp. 3d 176, 187 (D.D.C. 2016), *aff'd*, 137 S. Ct. 1204 (2017).  In applying exacting scrutiny to the electioneering communications disclosure rules, the panel underscored that it was the mention of a candidate, rather than the purpose of the ad, that justified the burden of disclosure.  *Id.* at 190–91; *see also Citizens for Responsibility & Ethics in Wash. v. FEC*, 299 F. Supp. 3d 83 (D.D.C. 2018) ("[T]he Supreme Court has seen no problem with disclosure requirements triggered solely by an electioneering communication's context: its timing, its reference to a candidate, and its viewership.").

---

requirements.  Def.'s Opp'n at 13  (citing 148 Cong. Rec. H410-411 (Feb. 13, 2002) (statement of Rep. Shays)).  But the Court does not possess any such authority.

Additionally, the Tenth Circuit came to a similar conclusion, after carefully laying out its reasoning, in *Independence Institute v. FEC*, 812 F.3d 787 (10th Cir. 2016). The speech in that case consisted of ads about an issue that also referred to an elected official (who happened to be up for reelection). *Id.* at 790. The plaintiff argued that the ads were "unambiguously *not* campaign-related," and therefore "exempt from disclosure requirements." *Id.* at 796. In an opinion authored by Judge Tymkovich, the Tenth Circuit rejected the argument. First, it held that the reasoning of *Citizens United* precluded the distinction urged by the plaintiff:

> The Court did not rest its holding on the ground that the public only has an interest in knowing who *references a campaign* shortly before an election. Rather, the Court upheld the application of the statute because of the public's interest "in knowing who is *speaking about a candidate* shortly before an election." *Citizens United*, 558 U.S. at 369, 130 S. Ct. 876 (emphasis added). Thus, in insisting that its ad is not "related to" a campaign . . . the [plaintiff] begs the question. The logic of *Citizens United* is that advertisements that mention a candidate shortly before an election *are* deemed sufficiently campaign-related to implicate the government's interests in disclosure.

*Id.*

Second, the Tenth Circuit noted that whether an ad is "campaign-related" was not, in any event, a workable constitutional test: "The difficulty of reliably distinguishing between campaign-related speech and non-campaign-related speech is why courts must look only to whether the specific statutory definitions before them are sufficiently tailored to the government's legitimate interests." *Id.* The Court shares this concern about drawing the same sorts of distinctions Plaintiffs urge upon it here, even though the speech at issue is commercial, and not issue-related. For example, Plaintiffs characterize Brown's ads as "wholly unrelated to any election activity." *Id.* But at the same time, as the FEC points out, Brown's campaign website touts her successful realty business as one of her qualifications for elected office. Def.'s Opp'n at 36–37.

For all these reasons, the Court finds that the disclaimer and disclosure requirements for electioneering communications likely are constitutional as applied to Brown's original ads. Plaintiffs are thus unlikely to succeed on the merits of Count I.

### C. Plaintiffs' Irreparable Harm in the Absence of Preliminary Relief

Although the Court need not reach the other preliminary injunction factors, *see Ark. Dairy Coop Ass'n*, 573 F.3d at 832, it notes that Plaintiffs also have not demonstrated irreparable harm because of the way in which that factor is intertwined with the merits, *see Pursuing Am.'s Greatness*, 831 F.3d at 511. When plaintiffs who bring First Amendment claims show a likelihood of success on the merits, they also typically prevail "because 'the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). "Conversely, the deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely." *Id.*

Here, because Plaintiffs are unlikely to succeed on the merits of their constitutional claims, they cannot show irreparable injury through the "loss of constitutional freedoms." *Mills*, 571 F.3d at 1312; *see* Pls.' Mot. at 26. The only harm Plaintiffs identify that might flow from the disclaimer and disclosure requirements is that "adding a disclaimer to the end of the Advertisements would confuse the public and destroy any commercial value those Advertisements have for Plaintiffs." Pls.' Mot. at 19; Am. Compl. Ex. D ¶¶ 41–43. But this risk of confusion and decreased commercial value does not meet the "high standard" that the D.C. Circuit has set for irreparable injury: that it "must be both certain and great" and "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The

Court has no information about the nature of this risk beyond Brown's own generalized speculation. Moreover, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisc. Gas Co.*, 758 F.2d at 674. Further, to the extent that Brown decides not to run the original ads rather than to include a disclaimer that she believes risks confusing her customers, that is a self-imposed restriction. *See* Am. Compl. Ex. D ¶ 43. Ultimately, on this record, the Court cannot conclude that Brown and her business will suffer irreparable harm in the absence of the preliminary relief they seek.

For all these reasons, Plaintiffs have not made the requisite showing for a preliminary injunction. Accordingly, the Court will deny their motion.

## IV. Conclusion

For all of the above reasons, the Court will deny Plaintiffs' Motion for a Preliminary Injunction, ECF No. 12. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 13, 2019